The State v. Johnson.

---

THE STATE OF KANSAS, *Appellant,* v. P. W. JOHNSON, *Appellee.*

No. 17,361.

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Regulating the Practice of any Healing Art.* Under the constitutional grant of power the legislature may prescribe reasonable restrictions and regulations respecting the practice of any branch or department of the healing art.

2. CRIMINAL LAW—*Practice of Chiropractic—License.* Chapter 254 of the Laws of 1901, as amended by chapter 63 of the Laws of 1908, creating a state board of medical registration and examination and regulating the practice of medicine, surgery and osteopathy, is constitutional, and embraces within its terms one who without registration, examination or license from such board, and for pay, practices or attempts to practice chiropractic by pretending to adjust the spine of one afflicted with bodily infirmities, or who advertises to treat, for pay, by chiropractic spinal adjustment, persons thus afflicted.

Appeal from Stafford district court. Opinion filed March 11, 1911. Reversed.

*Fred S. Jackson,* attorney-general, and *Ray H. Beals,* county attorney, for the appellant; *Frank L. Martin,* of counsel.

*Prigg & Williams,* and *Morris & Hartwell,* for the appellee.

The opinion of the court was delivered by

WEST, J.:  The first count of the information charges
that the appellee "did then and there unlawfully and
willfully practice medicine and surgery  . . .  by
then and there attempting to treat for a fee one William
Mershon, sr., who was then and there afflicted with
bodily infirmities and who was then and there sick, the
nature and extent of said sickness and bodily infirmi-
ties being to informant unknown, by then and there
pretending to adjust the vertebræ of the said William
Mershon, sr." A motion to quash was sustained, and
the state appeals.

The second, third, fourth and fifth counts are similar
to the first, except that they omit "pretending to adjust
the vertebræ." The sixth count charges the appellee
with advertising in a newspaper:

"Chiropractic. P. W. Johnson, D. C., the chiroprac-
tor of Hutchinson, Kan., will be in Stafford, at Hotel
Brinkman, Tuesday and Friday, 9 A. M. to 1 P. M.  If
you are afflicted in any way, or have tried everything
else without results, try chiropractic spinal adjust-
ment."

The cause has been so presented and argued that we
deem it proper to consider the first and sixth counts
only. The record shows that the trial court sustained
the motion to quash "for the reason that it is agreed by
both sides that said P. W. Johnson is a chiropractic
and practicing his profession as such, and is a graduate
of some school which teaches chiropractic and stands
ready to take an examination in chiropractic before the
state board of medical registration, but that the statutes
of the state make no provision for granting a license
to one practicing chiropractic, and has applied to take
such examinations before said board, but it has re-
fused to examine him or grant him a license to practice
in Kansas."

The appellant contends that the appellee comes

clearly within the well-known and well-defined meaning of the term "practice of medicine"; that the legislature may define the meaning, extend it, broaden it, make it more comprehensive; that chiropractic is an unknown word which can not be found in the dictionaries and which has been manufactured by a faker for use as a sham; that "he [appellee] does not belong in the class with physicians or surgeons, nor with any other class of men that are learned or have any knowledge of science."

The appellee insists that, being a graduate of a school which teaches chiropractic and standing ready to take an examination therein, he is not a physician, surgeon or osteopathist, and is not in any sense "practicing medicine and surgery"; and that the statute can not be extended to cover his case without violating the constitution in various ways.

We have no doubt whatever that the legislature may prescribe reasonable restrictions and qualifications touching the healing art in any of its departments without impairing any constitutional rights. (*The State v. Creditor*, 44 Kan. 565; *The State v. Wilcox*, 64 Kan. 789; *Meffert v. Medical Board*, 66 Kan. 710.) While the power does not exist to give one particular school of medicine a monopoly or to prohibit the citizen from using or employing the ordinary home remedies and neighborly ministrations, still, when one holds himself out to the public as a healer of disease by the use of means or methods vouched for by him, and for which he receives pay, the legislature may, for the protection of the citizen from quackery or imposture, require such person to possess and show certain qualifications for doing properly what he does and what he receives pay for doing.

It is essential to ascertain whether or not the legislature has made provision for a case of this kind. In 1870 chapter 68 was enacted, the title reading as fol-

lows: "A bill to protect the people of Kansas from empiricism, and to elevate the standing of the medical profession." Under this title provision was made with reference only to one "who shall practice or attempt to practice medicine in any of its departments, or perform or attempt to perform any surgical operations." (§ 2.) This was before the days of osteopathy, and certainly before chiropractic had become familiar. In 1901 chapter 254 of the laws of that year (Gen. Stat. 1909, §§ 8085-8089, 8091, 8092) was enacted with the following title:

"An act to create a state board of medical registration and examination, and to regulate the practice of medicine, surgery and osteopathy in the state of Kansas, prescribing penalties for the violation thereof, and repealing chapter 68 of the Session Laws of 1870."

Chapter 63 of the Laws of 1908 is entitled:

"An act amending chapter 254 of the Laws of 1901, the same being an act entitled 'An act to create a state board of medical registration and examination, and to regulate the practice of medicine, surgery and osteopathy in the state of Kansas, to provide penalties for the violation thereof, and repealing chapter 68 of the Session Laws of 1870,' and repealing section 6 of chapter 254 of the Laws of 1901."

This, it will be seen, leaves the title substantially as it was in 1901, so that the legislation now in force is to "regulate the practice of medicine, surgery and osteopathy." It is earnestly insisted that the act can be no broader than its title, and that chiropractic is not medicine or surgery or osteopathy, and therefore is left untouched by these provisions; that the rule of *noscitur a sociis* restricts the words found in the act of 1908 to their associates, medicine, surgery and osteopathy, and that this language can by no fair intendment be given sufficient elasticity to reach chiropractic. The language as amended is that anyone shall be "regarded as practicing medicine and surgery within the

The State v. Johnson.

meaning of this act who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine, or perform any surgical operation of whatsoever nature for the cure or relief of any wounds, fracture or bodily injury, infirmity or disease of another person, or who shall use the words or letters 'Dr.,' 'Doctor,' 'M. D.,' or any other title, in connection with his name, which in any way represents him as engaged in the practice of medicine or surgery, *or any person attempting to treat the sick or others afflicted with bodily or mental infirmities, or any person representing or advertising himself by any means or through any medium whatsoever, or in any manner whatsoever, so as to indicate he is authorized to or does practice medicine or surgery in this state, or that he is authorized to or does treat the sick or others afflicted with bodily infirmities,* but nothing in this act shall be construed as interfering with any religious beliefs in the treatment of diseases; provided, that quarantine regulations relating to contagious diseases are not infringed upon.    All persons who practice osteopathy shall be registered and licensed as doctors of osteopathy, as hereinbefore provided, but they shall not administer drugs or medicine of any kind nor perform operations in surgery."    (Laws 1908, ch. 63, § 1, Gen. Stat. 1909, § 8090.)

The words italicized are the ones inserted by the act of 1908.

Webster's New International Dictionary defines chiropractic as "a system of healing that treats disease by manipulation of the spinal column."    Counsel for appellee advises us that "the chiropractor claims that all the diseases which are in any way affected by his adjustments are caused by the partial displacement of the vertebræ, thus causing the nerves which pass through the openings in the vertebræ to press against the sides of the openings and prevent the life fluid from flowing freely through the nerve to the part of the human sys-

tem to which the particular nerve reaches. Diseases not caused by the pressing of the nerves against the sides of these openings the chiropractor does not in any way treat. The chiropractor claims that the only treatment, so-called, which he uses is not a treatment, but merely an adjustment of the vertebræ, which restores the vertebræ and the nerves to their normal position and thus removes the cause of the disease. He does not practice surgery or medicine, and does not use any other manipulations whatever than the adjustment of the vertebræ." But the language of the 1908 amendment is very broad, and even under the foregoing description of chiropractic it may well be said that one whose vertebræ are partially displaced, causing impairment of nerve function, is one afflicted with bodily infirmity, and that one who restores the functional activity of the nerve on which the maladjusted vertebra had formerly pressed is treating or attempting to treat such afflicted person.

It may be argued that, giving the entire language a close, critical and discriminating meaning and construction, this method of so-called treatment is in no sense the product of medicine or surgery, and would, indeed, come more nearly under the term osteopathy. But the manifest object and intent of the legislature was to protect the public from ignorance and imposition in the healing art. Osteopathy is carved out as a separate department, and registration and license are required, while its practitioners are prohibited from giving medicine and performing surgical operations—that is, from practicing medicine and surgery as distinguished from osteopathy. But medicine and surgery, which the appellee is charged with attempting to practice, by common use and adjudged meaning cover a wide portion of the domain of healing, and may and should be held to cover the case of one who, not claiming to be a physician or surgeon, really practices

osteopathy under another guise without possessing the qualifications required of the osteopath. Osteopathy is defined as "a system of treatment based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulations of these parts." (Webster's New Inter. Dict.) It has been judicially defined as "a method of treating diseases of the human body without the use of drugs, by means of manipulations applied to various nerve centers— chiefly those along the spine—with a view to inducing free circulation of the blood and lymph, and an equal distribution of the nerve forces. Special attention is given to the readjustment of any bones, muscles, or ligaments not in the normal position." (6 Words & Ph. Jud. Def. p. 5070.) Medicine is defined as "the science and art dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician." (Webster's New Inter. Dict.) The same authority defines surgery as the "art or practice of healing by manual operation; that branch of medical science which treats of mechanical or operative measures for healing diseases, deformities, or injuries."

In *State v. Miller,* (Iowa, 1910) 124 N. W. 167, the supreme court of Iowa sustained a conviction and held an indictment good which charged that the defendant "did wrongfully and unlawfully publicly profess to be a physician, . . . and to cure and heal diseases, nervous disorders, displacements, injuries, and ailments by means of a certain system and treatment known as chiropractic" (p. 167), under a statute which was formerly entitled "An act to regulate the practice of medicine and surgery in the state of Iowa" (p. 168),

27—84 KAN.

and which, in the code, was entitled "Of the practice of medicine" (p. 168). The court said:

"He gave no medicine, nor did he prescribe medicine. His system consisted of certain mechanical appliances which were used in connection with hand manipulations and an electric vibrator." (p. 168.)

But that the case fell squarely within the ruling in *State v. Heath,* 125 Iowa, 585, which held that the Iowa statute referred to includes magnetic healers, and *State v. Edmunds,* 127 Iowa, 333, which held that the statute includes one who attempts to cure by prescribing diet and eyeglasses. In *The People v. Arendt,* 60 Ill. App. 89, midwifery was held to be included within the provisions of an act regulating the practice of "medicine in any of its departments" (p. 91) without possessing certain qualifications. In *Benham v. The State,* 116 Ind. 112, one who held himself out as a physician and advertised that he treated and cured persons afflicted with the opium habit was held to violate "An act regulating the practice of medicine, surgery and obstetrics," etc. (p. 113.) In *Parks v. State,* 159 Ind. 211, substantially the same statute was held to include a "professor" who held himself out as a magnetic healer and who treated a lame ankle by holding and rubbing the afflicted parts. In *The People v. Gordon,* 194 Ill. 560, a magnetic healer who gave treatment in the nature of osteopathic treatment by "rubbing or kneading the body, for the purpose.of freeing the nerve force" (syl. ¶ 2), was held to be included in the expression "who shall treat or profess to treat, operate on or prescribe for any physical ailment or any physical injury or deformity of another." (Syl. ¶ 1.) The practice of obstetrics was, in *State v. Welch,* 129 N. C. 579, held to be the practice of medicine, following and approving *State v. Van Doran,* 109 N. C. 864. Osteopathy was held to be within the practice of medicine in *Eastman v. The People,* 71 Ill. App. 236. The Missouri court of appeals, in *State v. Blumenthal,* 141 Mo. App.

502, held that the practice of medicine includes the practice of ophthalmology. The court said:

"That term seems to signify some disease or diseases of the eye and we can see no reason why one who prescribes medicine for such diseases would not be as guilty as by any other name. It is the act committed, and not its designation, which constitutes the offense." (p. 505.)

In *Bragg v. The State,* 134 Ala. 165, it was held that osteopathy is within "the practice of medicine in any of its branches or departments" (p. 170), and that the term "practicing medicine" includes not simply those who prescribe drugs or other medicinal substances as remedial agents, but those also "who diagnose disease and prescribe or apply any therapeutic agent for its cure." (Syl. ¶ 2.) The supreme court of Nebraska, in *State v. Buswell,* 40 Neb. 158, held that an act to establish a state board of health to regulate the practice of medicine, surgery and obstetrics must be construed to include the practice of so-called Christian Science, which appeared to be both drugless and successful, for one witness testified that after being bitten by a rattlesnake he at once sought the defendant and the pain ceased after his treatment, and that during the second treatment the patient "felt it come right through" (p. 162) him and from that time on he had no more pain. In *State v. Bresee,* 137 Iowa, 673, one who did not assume to be a physician, but who after diagnosing a case prescribed and sold a tissue food, was held to be practicing medicine, and in *People v. Allcutt,* 102 N. Y. Supp. 678, one was held to be practicing medicine who advertised himself as a doctor practicing mechano-neural therapy and diagnosed cases and prescribed diet, conduct and simple remedies. In *Witty v. State,* (Ind. 1910) 25 L. R. A., n. s., 1297, one who held himself out as a doctor able to cure disease by suggestive therapeutics and who treated disease by

suggestion and laying on of hands was held to be practicing medicine.

The foregoing authorities, among many others, are sufficient, we think, to support the contention of the state that the first and sixth counts of the indictment were erroneously quashed. The legislature has, by the statutes referred to, treated osteopathy as a separate department, and covered all the other branches of the healing art by the term medicine and surgery. As new schools of practice come into favor their followers must possess the requirements for the practice of medicine or surgery, or prevail upon the legislature to make separate provision for them as it has done for the osteopath.

The ruling of the trial court is reversed.

WEST, J. (dissenting): The appellee, as shown by the record, is a graduate of some school which teaches chiropractic, and has applied to the state board of medical registration and examination to be given an examination and license to practice his profession, and his application has been denied, the statutes making no provision for granting such license. He does not profess to practice or to understand medicine, surgery or osteopathy, but "is a chiropractic practicing his profession." His theory seems to be that by the adjustment of the vertebræ certain ailments can be remedied, by relieving the nervous pressure incident to spinal maladjustment.

From all that can be found in the record and in the dictionary chiropractic is not osteopathy, for the latter includes kneading, rubbing and the manipulation of the entire body, and, as its derivation necessarily signifies, it has special reference to the osseous structure. The legislature, by the act of 1901, included within the healing art three departments—medicine, surgery, and osteopathy. It could as easily and as constitutionally have included the three in the practice of

medicine, but it saw fit to divide, differentiate, distinguish, separate. Section 1 of chapter 254 of the Laws of 1901 (Gen. Stat. 1909, § 8085) requires the seven members of the board to be physicians in good standing who have received the degree of M. D., "representation to be given to the different schools of practice as nearly as possible in proportion to their numerical strength in this state, but no one school to have a majority of the whole board. . . . No license to practice medicine and surgery shall be issued by the board upon less than five affirmative votes." Section 3 provides that all persons intending to "practice medicine, surgery or osteopathy" shall apply for a license, and that "all such candidates, except as hereinafter provided, shall submit to an examination of a character to test their qualifications as practitioners of medicine or surgery, . . . provided, further, that any graduate of a legally chartered school of osteopathy, wherein the requirements for the giving of a diploma shall include a course of instruction of not less than four terms of five months each, in two or more separate years, shall be licensed to practice osteopathy upon the presentation of such diploma." (Gen. Stat. 1909, § 8087.) Section 6, as amended by section 1 of chapter 63 of the Laws of 1908 (Gen. Stat. 1909, § 8090), defines the practice of medicine as set forth in the foregoing opinion, and following this definition the section concludes:

"All persons who practice osteopathy shall be registered and licensed as doctors of osteopathy, as hereinbefore provided, but they shall not administer drugs or medicine of any kind nor perform operations in surgery."

Language could not more clearly show an intention to distinguish utterly between osteopathy and the practice of medicine and surgery than does this.

Chiropractic is a word so unfamiliar that counsel assert that it can not be found in the dictionaries, and

The State v. Johnson.

certainly we can not assume judicial knowledge of what is meant by so novel a term. It will be observed from the definitions given by Webster to surgery and chiropractic that they are somewhat similar, and are apparently derived from the same root, meaning "hand." But the only light with which we have been supplied shows that chiropractic falls far short of osteopathy, and still farther short of surgery. If the manipulation of the spinal column for the purpose of relieving nerve pressure makes it equivalent to surgery or osteopathy, what shall we say of calisthenics, which is supposed to relieve all sorts of bodily pressure; of massage, which is thought to increase the circulation and which Webster informs us is "a method of treating the superficial soft parts of the body for remedial or hygienic purposes, consisting in rubbing, stroking, kneading, tapping, etc., with the hand or an instrument"? Because massage and chiropractic have or include something common to surgery and osteopathy, are we to hold that they are osteopathy or surgery? If the appellee is attempting to practice osteopathy without having the necessary qualifications he is justly subject to punishment. But until he is shown to have thus attempted to evade the law he can hardly be held guilty of a crime so far as the practice of osteopathy is concerned, and, the legislature having distinguished so clearly and so widely between osteopathy on the one hand and medicine and surgery on the other hand, he can not logically or consistently or legally be punished for practicing medicine and surgery merely because he may be thought to infringe in a slight degree upon the domain of the other department—osteopathy. A tree is known by its fruit, a man by his companions, and legal terms by their associates. The rule of *noscitur a sociis* requires that in an act relating to and regulating the practice of medicine and surgery, and, separately and almost incidentally, osteopathy, words professedly attempting to define the practice of medicine and surgery and to fix the limits there-

The State v. Johnson.

of have reference to, and must be associated with and assimilated to, the subject under consideration and the terms already used. Hence, in this attempt found in section 1 of chapter 63 of the laws of 1908 the words "by any means or through any medium whatsoever, or in any manner whatsoever," must be held to be on a social equality, so to speak, with the words "medicine and surgery," and not with the word "osteopathy," for this word does not occur anywhere in the definition. These words can not be taken in the utmost literal sense, for that would force them into the company of such terms as Fletcherism, fasting, ablutions, vegetarianism, and many others manifestly unthought of by the lawmaking body. Our legislature has, however, been mindful of the people's protection from professional ignorance and imposture. Not only has it provided all the safeguards already referred to, but it has, by section 6 of chapter 254 of the Laws of 1901, as amended (Laws 1908, ch. 63, § 1, Gen. Stat. 1909, § 8090), required the possession of certain qualifications for one who would practice as an optician, and has by other enactments made similar provisions concerning those who would practice optometry (Laws 1909, ch. 229, Gen. Stat. 1909, §§ 8786-8802) ; embalming (Laws 1907, ch. 387, as amended by Laws 1909, ch. 225, Gen. Stat. 1909, §§ 8753-8769) ; dentistry (Laws 1903, ch. 227, as amended by Laws 1907, ch. 196, as amended by Laws 1909, ch. 127, Gen. Stat. 1909, §§ 7983-7992) ; pharmacy (Laws 1885, ch. 150, as amended by Laws 1887, ch. 174, as amended by Laws 1897, ch. 164, Gen. Stat. 1909, §§ 8095-8112). Even our equine servants are not to be treated by a veterinarian unless the latter has passed a rigid examination and procured a license from the state board of veterinary examiners. (Laws 1907, ch. 388, as amended by Laws 1908, ch. 74, as amended by Laws 1909, ch. 232, Gen. Stat. 1909, §§ 8770-8785.)

But the legislature has not yet caught up with chiro-

practic or else it has thus far discovered no necessity for its regulation. That it possesses full constitutional power to surround chiropractic with restrictions similar to those touching medicine, surgery or osteopathy there can be no question, but it has not done so. To hold that it intended to do so in 1908 is to decide that the legislature intended to regulate a thing whose definition could not then be found in the latest dictionary.

But lest these remarks be considered dogmatic I will refer to a few decisions which seem to give support to the view that a reasonable construction of the present statute precludes the inclusion of chiropractic. In *Nelson v. State Board of Health,* 108 Ky. 769, it was held by the Kentucky court of appeals that osteopathy is not the practice of medicine in any of its departments. The act was entitled "An act to protect citizens of this commonwealth from empiricism" (p. 771), and one section thereof prohibited any person living in the state from practicing or attempting "to practice medicine in any of its branches, or who shall treat or attempt to treat any sick or afflicted person by any system or method whatsoever, for reward or compensation" (p. 774), without complying with the provisions of the act. The court quoted with approval (p. 779.) from *Smith v. Lane,* 24 Hun (N. Y. Supr. Ct.) 632, where, in speaking of osteopathy, it was said:

"While it might be no benefit, it could hardly be possible that it could result in harm or injury. . . . His system of practice was rather that of nursing than of either medicine or surgery. . . . He neither gave nor applied drugs or medicine, nor used surgical instruments. He was outside of the limits of both professions, and neither one of the schools or societies mentioned in the act had jurisdiction over him." (pp. 634, 635.)

The Kentucky court, in speaking of Nelson, said:

"If by kneading and manipulating the body of the patient he can give relief from suffering, we see no reason why he should not be paid for his labor as

other laborers. Services in kneading and manipulating the body are no more the practice of medicine than services in bathing a patient to allay his fever or the inflammation of a wound." (108 Ky. 782.)

The supreme court of Ohio, in *The State of Ohio v. Liffring,* 61 Ohio St. 39, decided that osteopathy is not within the terms of an act "to regulate the practice of medicine" (syl.) which forbids the prescribing of any "drug or medicine or other agency" (syl.) by a person not registered by the state board of medical registration and examination. In the opinion it was said:

"In obedience to the maxim, *noscitur a sociis,* the meaning of the word agency must be limited by that of the associated words 'drug' and 'medicine.' . . . It requires the conclusion that the agency intended by the legislature is to be of the general character of a drug, or medicine, and to be applied or administered, as are drugs or medicines, with a view to producing effects by virtue of its own potency." (pp. 50, 51.)

After this decision the statute was amended, bringing within the term "practice of medicine" one "who shall prescribe, or who shall recommend for a fee for like use, any drug or medicine, appliance, application, operation or treatment, of whatever nature, for the cure or relief of any wound, fracture or bodily injury, infirmity or disease" (2 Bates's Ann. Ohio Stat., 6th ed., § 4403*f*), the amendment also making specific provision for registration by osteopaths; and in *The State of Ohio v. Gravett,* 65 Ohio St. 289, the amendments were held to include the practice of osteopathy. This was merely deciding that the practice of osteopathy was comprehended within the words "appliance, application, operation or treatment, of whatever nature," and this under an act which did not by its title purport to separate osteopathy from medicine and surgery and which had manifestly been amended for the very purpose of including osteopathists. However, in *Hayden v. State,* 81 Miss. 291, the supreme court of

Mississippi held that osteopathy was not covered by a statute defining the practice of medicine as "to prescribe or direct for the use of any person any drug, medicine, appliance or agency . . . for the cure of any disease" (syl.) or injury, not being either an appliance or an agency within the meaning of the act. The court said:

"A wise legislature sometime in the future will doubtless make suitable regulations for the practice of osteopathy, so as to exclude the ignorant and unskillful practitioners of the art among them. The world needs and may demand that nothing good or wholesome shall be denied from its use and enjoyment." (p. 299.)

In *Bennett v. Ware*, 4 Ga. App. 293, the court of appeals of Georgia in 1908 held that *prima facie* a "magic healer" who takes the money of the sick and professes to heal them without the use of medicine, by placing his hands upon that portion of the body that is affected by pain, and claims that the healing results from "magic power given directly from the Lord," is engaged in a fraudulent practice, but that he is not thereby engaged in the practice of medicine. The statute under which this "magic healer" was prosecuted provided:

"The words 'practice medicine' shall mean, to suggest, recommend, prescribe or direct, for the use of any person, any drug, medicine, appliance, apparatus, or other agency, whether material or not material, for the cure, relief or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound, fracture or other bodily injury, or any deformity, after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift or compensation." (Code of Ga., vol. 1, § 1478.)

The court held that an examination of the statute showed an intention to recognize only three systems or schools of medicine—the allopathic, homeopathic and eclectic, no means being provided for a practitioner

The State v. Johnson.

·of any other school to secure a license.  In answer to the argument that the definition just quoted embraced the practice under consideration the court said:

"It may be conceded that' the words 'material or not material' are sufficiently broad to include at least every human or natural agency.  But was it intended by the legislature to denominate as a medical agency, whether material or not material, an agency claimed to be su-·pernatural? . . . In other words, the word 'agency,' even as qualified by the words 'material or not material,' was intended by the legislature to mean a substance of the general character of a drug or medi-·cine, or surgical apparatus or appliance, the obvious purpose being to protect society against the evils which might result from the use of drugs and medicines by the ignorant and unskillful."  (4 Ga. App. 297, 298.)

In *The People v. Smith*, 208 Ill. 31, a traveling seller ·of spectacles advertised himself as a famous eye expert, and invited those afflicted with divers ills, including dizziness, neuralgia, headaches, trembling spells, and various nervous brain affections, to call on him and have spectacles fitted which would benefit his patrons.  It was held that while it is a well-known fact that headaches, dizziness and other similar ailments ·often result from defective vision, which may be relieved by the use of spectacles, still, to hold that this man was professing "to treat, operate on or prescribe for any physical ailment or any physical injury to or deformity of another" (p. 33) was not warranted. The court said:

"While the statute under consideration is a wise and humane regulation for the protection of the public, and should be rigidly enforced, the construction here ·contended for could have no other effect than to bring it into disrepute." (p. 34.)

While we are not advised what qualifications the school which graduated the appellee required him to possess, the presumption of innocence is probably broad ·enough to warrant the assumption that the requirement

The State v. Johnson.

was reasonable and that the graduate has some skill and knowledge touching the practice of chiropractic. He offers to be examined, but no one on the board knows how to conduct the examination, for the statute has given no directions. Two reasons exist why we can not assume that the public needs protection from the appellee: one, that there is no evidence that his practice is in any way harmful; the other, that a vigilant legislature has either not heard of chiropractic at all or has heard no harm of it, for the crimes act has not been so enlarged as to bring the chiropractor within its field of operation. Indeed, the first count of the information only charges that the appellee practiced medicine and surgery by attempting to treat one afflicted with bodily infirmities, "by then and there pretending to adjust the vertebræ of the said William Mershon, sr." While, as already suggested, we should not assume without proof that adjusting the vertebræ is harmful, by so much the more we should withhold the assumption that Mr. Mershon was injured by the chiropractor's pretending to do so. Practicing medicine by attempting to treat one by pretending to adjust the vertebræ has not in my judgment been legislatively elevated to the dignity of a crime.

The ruling of the trial court should be affirmed as to the first and sixth counts of the information.